Brinkerhoff, C.J.
This is a petition in error, filed in tbe district court of Tuscarawas county, seeking to reverse a judgment of tbe court of common pleas of that county, and reserved for decision in this court.
Tbe case made by tbe parties in tbe court below, through the medium of their pleadings, is so well stated in the pleadings themselves, as to make an attempt at abbreviation hardly worth while. The pleadings are as follows:
eetition :
The plaintiff says:
“ On the first day of July, A.D. 1863, he and one Alvin Yinton were joint owners of seventeen head of horses, and that on said first„day of July, A.D. 1863, the defendant then being a common carrier of goods, chattels, and live-stock, for hire, from the town of New Philadelphia, in the county of Tuscarawas and State of Ohio, to Pittsburg, in the State of Pennsylvania, the plaintiff, for himself and the said Alvin Yinton, in the name of the plaintiff, delivered to the defendant as. such common carrier, at their depot in said town of New Philadelphia, and the defendant then and there received from the plaintiff and said Alvin Yinton, in the name of the plaintiff, one car load of horses, to wit: the seventeen head of horses aforesaid, of the value of two thousand one hundred and twenty-five dollars, of the plaintiff and said Alvin Yinton, to be carried by the defendant from the town of New Philadelphia aforesaid, to Pittsburg aforesaid, and there, to wit: at Pittsburg aforesaid, to be safely delivered by the defendant to one J. C. Jones, for the plaintiff, and said Alvin Yinton, for a certain reward then paid by the plaintiff to the defendant in that behalf.
“ The defendant neglected its duty, and did not safely carry the said seventeen head of horses from New Philadelphia aforesaid to Pittsburg aforesaid, nor there, to wit: at Pitts-burg aforesaid,-deliver the same to the said-J. C. Jones for the plaintiff and said Alvin Yinton, but by the default of the said defendant in the premises, sixteen head of said horses, of the value of two thousand dollars, were and are wholly lost to the plaintiff and said Alvin Yinton;
*443 “ That on the eleventh day of September, A.D. 1865, het said Alvin Yinton sold and assigned to the plaintiff his interest in this cause of 'action, and that by reason of the default of the defendant as aforesaid, he is damaged in the sum of two thousand dollars, with interest from the first day of July, A.D. 1868, for which sum he prays judgment against the' defendant.”
answer :
“In answering the petition of the plaintiff, the defendant says:
“That the said plaintiff did, on the first day of July, 1863, deliver to the defendant, at New Philadelphia, a car load of seventeen horses, to be transported from New Philadelphia to' the city of Pittsburg in the State of Pennsylvania, consigned to' J. C. Jones.
“ That on or about the second day of July, 1863, the defendant delivered all of said horses, then being in good condition, at the yard and stable of Blair & Raile, in the city of Alleghany, who received said horses into their stable; that the city of Allegheny adjoins the city of Pittsburg, and is separated therefrom only by the Alleghany river, where there were suitable yards and stables for the reception and keeping of horses, adjacent to the road of the defendant, while there were no such yards and stables adjacent to the road of the defendant in the city of Pittsburg.
“ That the said plaintiff, afterward, and on or about the third day of July, 1863, accepted and took possession of all of said horses, then being in good condition as aforesaid,, while in said stable of Blair & Raile, situated in the city of Alleghany aforesaid.
“ That afterward, on or about the fourth day of July, 1863, ■and after the said plaintiff had accepted and taken possession of said horses, sixteen of said horses were casually destroyed by fire while in said stable of Blair & Raile, and which destruction of said sixteen horses by fire, at the time and place aforesaid, constitute the grievance complained of by the said plaintiff, in his said petition.”
*444 REPLY :
“ The plaintiff, in reply to the answer of the defendant, says that he denies that he, on or about the third day of July, 1863, or at any other time,- accepted and took possession of said horses while in the stable of Blair & Haile, in the city of Alleghany, or at any other place.”
The issue thus made up by the parties in their pleadings presented the single question, whether or not the plaintiff, Sargent, “ accepted and took possession ” of the horses “ while in the stable of Blair & Haile in the city of Alleghany.”
The case was tried to a jury, who returned a verdict in favor of the plaintiff for $2399.
■After verdict, and before judgment, the defendant moved for a new trial, on the grounds, among other things, that the court erred in its charge to the jury, in refusing to charge the jury as requested by the defendant, and that the verdict of the jury was contrary to law, and not sustained by sufficient evidence. The court overruled the motion for a new trial, and entered judgment on the verdict.
A bill of exceptions was taken, embodying all the evidence given on the trial, together with the charges as to matter of law which the defendant requested the court to give to the jury, and which the court declined to give as requested, and the charges which the court did give to the jury upon the points suggested by the defendant’s requests. And the petition in error contains such assignments of error as bring the questions made on the motion for a new trial under review before us.
There áre several important elements in the case thus presented for our consideration, which do not depend on the evidence, but stand admitted on the face of the pleadings. They are these:
The defendant, as a common carrier, received the horses, and agreed to deliver them at the city of Pittsburg, unless prevented by the act of God, or the force of public enemies. For some reason, not appearing in the record, it did not transport them to nor deliver them at that place; but the *445 horses were taken from the cars hy the servants of the railroad company, and placed in good condition in the stable of Blair & Eaile, in the city of Alleghany, which is separated by a river from the point of destination,— Pittsburg. The plaintiff liad paid the company in advance for the transportation of his horses to, Pittsburg,, and the company could therefore, have no lien upon them on any account as against him. He had committed the custody and control of the horses to the company for the purpose of transportation; but he was at liberty, and had the right, to resume the custody and control of them at any time, or at any point, between the time and the point of their shipment and their arrival at the designated destination, whenever and wherever he could do so without unreasonable and improper interference with the business of the company. The horses were destroyed by an accidental fire while in the stable of Blair & Eaile, where the company had places! them; and, at the date of their destruction, the time had not yet elapsed during which the company might, without subjecting itself to the charge of-unnecessary delay, have transported them to and delivered them at Pittsburg. It follows, that if the plaintiff “ accepted and took possession ” of the horses while they were in the stable at Alleghany, he did no more than he had a right to do, and which the company had no right to forbid; but if he did so, he made it impossible for the company to fulfil its contract with him to the letter, accepted what the company had done as a virtual fulfilment of its contract, and absolved it from all further obligations in respect to the property which had been committed to its charge. Did he thus “ accept and take possession of the property”? That was the question before the court and jury.
• Erom the pleadings it appears that the consignee named in the bill of lading, to whom the horses were to be delivered at Pittsburg, was one J. C. Jones; and from the evidence it appears that this Jones was a man in the employ of the plaintiff, and accompanied him in a passenger train to Pitts-burg, a few hours in advance of the mixed train which earned the horses. That the horses were shipped on the first *446 of July, aud arrived at and were placed in the stable of Blair & Eaile, in Alleghany, on the night of the second of July During the forenoon of the next day the plaintiff found his horses at the stable of Blair & Eaile, and what occurred there is thus stated in the testimony of Blair:
“I saw Mr. Sargent the next morning after the horses were unloaded at my stable. He told me that the horses belonged to him, and for me to take charge of them and feed them properly until he would come for them or send for them, or something to that effect. I remarked to him that if he wished to ship the horses to the East, or farther East, they could be reloaded at that station, and I thought they could be shipped that afternoon. His reply was that he expected more horses in the beginning of the following week, and that he would leave these until the others arrived, and ship them all together. This is about the substance of the conversation.”
William Taylor, the hostler of Blair & Eaile, testifies thus:
“ Mr. Sargent had some conversation with me respecting the horses. He claimed the seventeen horses on the north side of the barn, which were delivered the night before. He said he had looked for the horses over at Pittsburg. He told me to take them then, and take care of them. I told Mr. Sargent that the halters on the horses were very poor. He told me, if I had any, to put better ones on. I told him I had. He said he had more horses coming from the West. He told me to take them (the seventeen already delivered) and take care of them, and he would pay me for my trouble. He told me he was going away, and he would be gone for three or four days. I think he said he was going to New Philadelphia. He wanted me to take care of the horses until he returned.”
To maintain the issue on his part, the plaintiff offered himself as a witness, and testified:
“ That he was shipping stock in the summer of 1863; both horses and mules, but principally horses. In July, 1863, shipped horses to Pittsburg, consigned to J. C. Jones, whom he employed for that purpose. Was at Pittsburg on the *447 second day of July, 1863, waiting for these horses. Took the passenger train at Bayard, and thinks he got into Pitts-burg about twelve o’clock at night of the first day of July, 1863. Waited about Pittsburg till the morning of the third of July, 1863, when he went over to Alleghany City to look for his horses. Cannot tell how many stables he examined ; went into Blair & Raile’s stables and there found my homes. Pound them between eleven and twelve o’clock. Told Taylor to take good care of the horses till I came back, or returned again. That is all I said to the boy about the horses. I stated to him to take good care of the horses till I came back, and 1 would pay him. Don’t recollect saying anything about halters, but it might be possible that I did. Taylor is the same person whose deposition has been read; he was the hostler at the stable of Blair. I think the boy Taylor went in after Mr. Blair, or Mr. Blair came out, I do not know which. I do not recollect whether I had any conversation with Mr. Blair; if 1 had any, 1 told him to take good care of the horses till I retxvrned. No one was with me that I recollect; there might have been some boy around there. Think I was not in Blair’s hotel on that occasion. I said nothing further to Taylor or Blair on that occasion, except what I have stated. I did nothing more than to tell them to take good ears of the horses till I retxmied. I did not exercise any acts of ownership over the horses; I only told them to take good care of them till I returned. I did not even see all of the horses. They only pointed me out three or four of the horses.
“No conversation was had about re-shipping the horses or bringing other horses there, for I had no horses to bring there. There was no such conversation at that time; and had no such conversation with Blair on that subject at any time. I had no horses at New Philadelphia. Had horses at Pittsburg, at the point at which I expected these to arrive, and I wished to place them all together. Pittsburg was the market for the horses, the point at which I had them inspected by the Government, and at which I expected to sell them. Kept my horses at Clark’s stables. After I left tha *448 stable of Blair I think I went over to Pittsburg to get on the afternoon train to go home, though I have no distinct recollection. I left, I think, at two o’clock in the afternoon, and came home on that train. Heard that the horses were burned on the evening of the third or the morning of the fourth of July. Never paid anything for keeping them; was never asked for anything.
. “ Stayed over in Pittsburg the second day of July waiting for the horses. Started the next morning over to Alleghany City. Was acquainted with the locality of the stables there. The cost of taking the horses over to Clark’s stables from Alleghany City would have been from ten to fourteen dollars. In taking the horses over through the streets should have been in danger of having them run against by drays, teams, and street-cars, and if they did get injiu’ed it would have depreciated them very much in the market.
“First heard that the horses were burned, at Wellsville, on my way back to Alleghany City, on- Monday, the sixth of July; saw a Pittsburg paper there containing an account of the fire.”
CROSS-EXAMINATION:
“When I left New Philadelphia for Pittsburg, on the,first of July, the horses were in the same train with me; but when we got to Bayard I took the passenger, train, and the horses came on in the freight train. I arrived in Pittsburg about twelve o’clock that night. If we left -New Philadelphia in the afternoon, the horses should have arrived in Pittsburg the evening of the second of July; if we left New Philadelphia in the morning, the horses should have arrived in Pittsburg on the morning of the second of July, if no delays occurred.
“ Cannot now say whether the horses left New Philadelphia in the morning or in the afternoon. Cannot say whether I went to any other stable in Alleghany City before I went to the stable of Blair & Raile. Went from the stable of Blair & Raile to the depot; but have no distinct recollection whether I went to Alleghany City depot or to the Pittsburg depot, to take the train home. My impression *449 is that I went over to Pittsburg and took the train for home at that point. v' Think I did not take the train at Alleghany City depot. Took the train for home about two o’clock in the afternoon of the third of July, and got home the samé evening. J. G. Jones came home with me on the same train?
Other testimony was given in the case, and that which I have herein stated was drawn out in more minute detail in the process' of examination and cross-examination. But in all that, as we think, there was nothing revealed which tended to vary the substantial elements of the case as here given.
The testimony on both sides being closed, the defendant asked the court to charge the jury as follows:
“ 1st. That although the defendant had engaged to trans-1* port said horses from New Philadelphia to Pittsburg, and it was a violation of defendant’s engagement to unload-the horses at the stables of Blair & Eaile, in Alleghany City, still the plaintiff might accept the horses at Alleghany City after they were unloaded there by the defendant; and if the plaintiff did accept the horses at Alleghany City, he cannot recover of the defendant the value of the horses.
“2d. That if the plaintiff went to the stables of Blair & Eaile, in Alleghany City, after the horses were unloaded there by the defendant, and employed said Blair & Eaile, who undertook the same, to keep and care for said horses for an indefinite period of time, the determination of which depended solely upon the act of the plaintiff himself, and not at all upon the act of the defendant, such an act would, in law, be an acceptance of said horses.
“ 3d. That the acceptance • of said- horses by the plaintiff while in the stables of Blair & Eaile did not require the plaintiff to take manual possession of said horses, but it was sufficient in law to constitute an acceptance of said horses, if the plaintiff employed Blair & Eaile, who undertook the same, to keep and care for said horses, then being in their stables, until he should go from Alleghany City to the town. *450 of New Philadelphia in Ohio, and return again to Alleghany City.
“4th. That if the plaintiff employed Blair & Raile to beep and care for said horses until he should go to Ohio and return to Alleghany City, the defendant would thereafter have no authority, and be under no obligation, to take the horses from the stables of Blair & Raile, in Allegheny City, to Pittsburg, in discharge of defendant’s agreement to transport said horses to said last-named place, during the time said plaintiff was absent to Ohio.”
“Upon the first request of the defendant the court charged the jury that the plaintiff might accept his horses after they were unloaded in the stables of Blair & Raile; and if he did accept them after they were unloaded there, he could not recover of the defendant the value of the horses. But the court further charged the jury, that the word “acceptance,” in this connection, had a legal signification. So in this connection the word “ acceptance,” as used in the answer, must be held to mean that the plaintiff had taken the exclusive possession of the horses, after they were unloaded, in the stable of Biair & Raile. If the plaintiff did take such exclusive possession of the horses, or otherwise exercised such control as was inconsistent with the rights of the defendant, then he could not recover for the value of the horses; but if he did not take such exclusive possession of them, or exercise such control, then he would be entitled to recover the value ■ of the horses when they were burned up in the stable of . Blair & Raile.
“Upon the second request of the defendant, the court • charged as requested.
“ Upon the third request of the defendant, the court ■ charged the jury that an acceptance of the horses by the plaintiff while in the stable of Blair & Raile did not require -the plaintiff to take manual possession of the horses. But ■ the court further charged the jury, that it was apparent from ■ the said request that the defendant was of opinion that if the plaintiff employed Blair & Raile, who undertook the same_ sto keep and care for said horses, then being in their stables, *451 until he should go from Alleghany City to the town of New Philadelphia, in Ohio, and return again to Alleghany City, such act would be of itself conclusive evidence of the acceptance of the horses by the plaintiff; but that such act would not be conclusive evidence of the acceptance of the horses by the plaintiff. That concluswe evidence was that kind of evidence which did not admit of any contradiction or explanation. Prima facie evidence was that kind of evidence which might be contradicted or explained. That if the plaintiff went to the stable of Blair & Eaile after the horses were unloaded by the defendant, and employed Blair & Eaile, who undertook the same, to keep and care for said horses, then being in their stable, until he should go from Allegheny City to the town of New Philadelphia, in Ohio, and return again to Alleghany City, such act would not be concluswe evidence of the acceptance of the horses by the plaintiff, but it would be strong jprima facie evidence of the acceptance of the horses by the plaintiff, and which 'must establish the acceptance of the horses by the plaintiff, unless overcome by other facts and circumstances, in evidence in the case, showing that the plaintiff did not intend to take exclusive possession of the horses.
“Upon the fourth request of the defendant, the court charged the jury, that, unless the plaintiff accepted the horses in the stable of Blair & Eaile, in the manner in which the court had already defined the word acceptance, then the defendant had authority, and would be under obligation, to take the horses from the stable of Blair & Eaile, and transport them to Pittsburg, in discharge of their agreement, "during the time the plaintiff was absent to Ohio.”
To the several charges as given, and to the refusal of the court to charge as requested, the defendant excepted, and they are now assigned for error.
Looking at the charges of the court as given, and the charges refused to be given, as abstract legal propositions, we are not able to see any error in giving the former, or in rejecting the latter.
The strain of the case, so far as the law is concerned *452 seems to lie in the third proposition, requested by the defendant to be given in charge to the jury, and refused to be given by the court as requested; and which was given with modifications-and qualifications.
Now, in order to constitute error in the refusal of a court to charge a jury as requested, the proposition requested and refused must be absolutely true under all -reasonably conceivable circumstances. And it is not absolutely true under all reasonably conceivable circumstances,
“ That the acceptance of said horses by the plaintiff while in the stables of Blair '& Baile did not require the plaintiff to take manual possession of said horses; but it was sufficient in law to constitute an acceptance of said horses, if the plaintiff employed Blair & Baile, who undertook the same, to keep and cai’e for said horses, then being in their stables, until he should go from Alleghany City to the town of New Philadelphia, in Ohio, and return again to Alleghany City.”
There are readily conceivable circumstances of fact, which, if proved, may have rendered this proposition not true. For instance, let us suppose that Sargent had called on the proper representatives of the railroad company, and learned from them that, on the arrival of the train carrying his horses at Alleghany, they had found the bridge over the river between Alleghany and Pittsburg blocked up by the wreck of a preceding train; in consequence of which it was impossible for the company to fulfil their contract with him until that wreck was cleared away. Suppose that the agents of the company had thereupon directed him to go to the stable of Blair & Baile, in Alleghany ; that he would there find his horses; and to request them to keep his horses until his return from New Philadelphia, in Ohio; and that on his return the company would re-embark his ’ horses and transport them to Pittsbm’g under and in pursuance of the original contract between him and the company. Suppose that he had accepted and acted upon this proposition. Will any one doubt, that during the time between his departure for and his return from New Philadelphia, within a reasonable time, the company would have been responsible for th® *453 safety of the horses ? We think not. The difficulty lies not in the correctness, or otherwise, of the legal proposition in the abstract, but in the inquiry whether there is anything in the evidence to which the modification by the court of the defendant’s request can apply. There is nothing in the evidence in the case tending to show that there was any intercourse or communication whatsoever between the railroad company or its agents and the plaintiff below, between the time when the horses were shipped at New Philadelphia and the time when he found them deposited at the stable of Blair & Raile, in Alleghany. He found them there deposited, and without any complaint to anybody, and without any complaint as to the conduct or failure of anybody connected with the contract of shipment, he directed, as he lawfully might do, that the horses should remain in the custody of Blair & Raile until his return. He named no definite period of time when he would return; thus leaving the time during which they should have the care and custody of the horses wholly indefinite, and dependent on his fortune or his will. And to these facts is to be added what seems to us to be a conclusive circumstance in the case as it stands, which is, that the horses were, by thé terms of the bill of lading, consigned to J. O. Jones at Pittsburg, who was the hired hand of Sargent, and that, after giving his orders to Blair & Raile as to the keeping of the horses, he at once took Jones back with him to New Philadelphia, and so left no consignee at Pitts-burg, to whom the horses could be delivered during his absence.
Eor these reasons, and there being nothing in the evidence to counteract their effect, we are of opinion that the verdict was clearly against the evidence, and that the court below erred in overruling the motion for a new trial.
Judgment reversed, and case remanded to the common pleas for a new trial. ■
Scott, Welch, White, and Day, JJ., concurred.